**UNITED STATES BANKRUPTCY COURT
FOR THE
DISTRICT OF MASSACHUSETTS**

~~~~~~~~~~~~~~~~~~~~~~~~~~~~~~~

In re
**CHARLES CURTIS MILLS**,                                    Chapter 7
    Debtor                                    Case No. 11-14097-JNF

~~~~~~~~~~~~~~~~~~~~~~~~~~~~~~~

**ANDREW S. RICHARDSON**,
    Plaintiff
v.                                                          Adv. P. No. 11-1245
**CHARLES CURTIS MILLS**,
    Defendant

~~~~~~~~~~~~~~~~~~~~~~~~~~~~~~~

**MEMORANDUM**

## I. INTRODUCTION

On January 11, 2016, January 12, 2016, January 21, 2016, February 11, 2016, and

March 2, 2016, this Court conducted a trial with respect to the Second Amended

Complaint to Determine Dischargeability of Debt (the "Complaint") filed by the Plaintiff,

Andrew S. Richardson (the "Plaintiff" or "Richardson").[1]  Pursuant to his four-count

Complaint, the Plaintiff seeks to except a debt owed to him by Charles Curtis Mills (the

---

[1] This Court has jurisdiction pursuant to 28 U.S.C. § 1334.  The matter is a core proceeding
pursuant to 28 U.S.C. § 157(b)(2)(I).

"Defendant," the "Debtor," or "Mills") from discharge pursuant to the following counts: Count I – Exception to Discharge under 11 U.S.C. § 523(a)(4) (Embezzlement); Count II – Exception to Discharge under 11 U.S.C. § 523(a)(2)(A) (False Pretenses, False Representation, or Actual Fraud); and Count III – Exception to Discharge under 11 U.S.C. § 523(a)(4) (Fraud or Defalcation While Acting in a Fiduciary Capacity). The Plaintiff also seeks attorney's fees pursuant to Count IV. The Defendant filed an "Amended Response & Answer of Defendant to Plaintiff's Amended Complaint." In addition, the parties filed a Joint Pretrial Memorandum in which, as required by this Court's pretrial order, they set forth "[f]acts which are admitted and which require no proof," as well as issues of fact remaining to be litigated.

At trial, six witnesses testified, including the Plaintiff and the Defendant, and numerous exhibits were introduced into evidence. The Court now makes its findings of fact and conclusions of law in accordance with Fed. R. Bankr. P. 7052.

## II. FACTS

### A. Background

The Debtor filed a voluntary petition under Chapter 7 on April 30, 2011. He filed schedules of assets and liabilities with his petition, as well as other required documents. On Schedule D-Creditors Holding Secured Claims, the Debtor listed Richardson as the holder of a writ of attachment against his home located at 22 Rustic Drive, Cohasset, Massachusetts in the amount of $390,000.00. The Chapter 7 Trustee filed a Report of No Distribution in the Debtor's Chapter 7 case on June 16, 2011. The Court entered the order

of discharge on November 2, 2011.  Richardson, however, timely filed his Complaint

seeking to except the obligation owed to him by the Debtor from discharge.

The Plaintiff resides at the Ocean Reef Club, 31 Ocean Reef Dr., #401, Key Largo,

Florida.  The Defendant, as noted above, resides in Cohasset, Massachusetts.  He owned

a lacrosse-training business called MaxLax Lacrosse Programs, LLC ("MaxLax") during

the period when he and Richardson engaged in the real estate project giving rise to

Richardson's Complaint.  MaxLax was a sole member limited liability company and, in

Mills's words, he was "coach, tutor, mentor, dishwasher, whatever needed to be done."

B. The Scituate Project:  Chronology of Events

Sometime in the late summer or early fall of 2002, Richardson and Mills, who had

been close friends since college in the 1970s or early 1980s, discussed a real estate

development project that entailed the acquisition of property located at 49 Glades Road,

Scituate, Massachusetts (the "Property"), the demolition of the existing structure, and the

construction and sale of a high-end residence (the "Project").  The Property is in a very

desirable, waterfront location, namely, "the Golden Mile" in the Minot section of Scituate.

Mills testified that he first noticed the Property while riding his bicycle in Scituate and

approached Richardson with the proposal to develop and sell the Property.

The terms of the arrangement to develop the Property were not reduced to a

writing.  According to Mills, "[t]he discussions and conversations that I had with Andy

[Richardson] were around going ahead and buying the property, developing the

property, selling the property and then splitting any profits that we made from it,"

although he added:  "[w]e had no discussions about [how] those profits would be

calculated." He further stated: "He agreed to put in the money; I agreed to manage the project."

Richardson testified about his understanding of the Project based upon his conversations with Mills. He stated:

> [S]o the terms of the project were the bank will not give us loan money towards this project unless we come up with cash of our own. So I was the cash guy, come up with the money for the deal and he's the guy that does the legwork and then we split the profits. I contribute loan money to begin with and when the project is sold, I get my loan money back plus split the profit 50/50.

Richardson testified that he and Mills reached an agreement, after "only one conversation," that the profit would be calculated based upon the sales price minus costs and that his loan money would be repaid first. He stated: "It was to me a lien just like the bank liens or it was -- that's the way I felt about it, you know. I was lending him the money. He was the legwork guy. I was the cash guy." Richardson, however, did not obtain a mortgage on the Property, although he visited the Property before issuing a check to Mills. He also testified that there were never any discussions about Mills contributing funds to the Project. Richardson testified that he "trusted Curt Mills implicitly. He was a friend of mine for 20 years." Although Richardson "built a boat yard on Cape Cod," he did not testify to any other significant real estate development experience.[2]

---

[2] The Court notes that the parties' agreement did not contain any recognition that Mills might be entitled to some credit for his "sweat equity" in overseeing the Project. Mills did not raise this point in either his testimony or documents filed in the adversary proceeding. Moreover, the parties did not provide for a separate bank account for

On or about September 11, 2002, Richardson mailed Mills a signed check, numbered 289 on his SchwabOne account, which listed "Curt Mills" as the payee, and "$200,000.00" as the amount payable.   On September 12, 2002, Mills deposited Richardson's check for $200,000.00 into his Fleet checking account, numbered ******7124, which Mills used, among other bank accounts, to hold and distribute funds for his personal use, for his MaxLax business, and for the Project.

On September 23, 2002, Mills executed a written "Offer to Purchase Real Estate" in which he and "his Associate" offered to purchase the Property from members of the Donoghue family for $675,000.00.

On October 21, 2002, Richardson executed a power of attorney "[g]iving and granting unto ["CURT MILLS, 22 Rustic Drive, Cohasset, Plymouth County, Massachusetts"] full power and authority to do and perform every act and thing whatsoever requisite and necessary to be done in and about the premises for the stated purpose and to execute any and all documents [Richardson] might execute, if [Richardson] were personally present, as they may relate to the purchase sale, development, improvement, lease, mortgage or lien, and/or any other related activities pertaining to the use and appropriation of the property described as 49 Glades Road, Scituate MA." Richardson subsequently provided the original power of attorney to Mills.

Sometime after Richardson provided the power of attorney to Mills, Mills, individually and as attorney in fact for Richardson, executed a document entitled

---

depositing Richardson's monetary contribution and construction loan proceeds and for paying Project-related expenses.

"Purchase and Sale Agreement By and Between Geraldine D. Logan, David E. Donoghue, Jane M. Gifford and John E. Donoghue ("Seller") and Curt Mills and Andrew Richardson ("Buyer") Pertaining to 49 Glades Road, Scituate, Massachusetts." On the last page of the document, in the section labeled "Buyer," Mills signed the document in his own name and "[a]s Attorney In Fact For: Andrew Richardson." To effectuate the purchase of the Property, Mills, individually, and as Richardson's attorney in fact, applied for a $540,000.00 loan from Rockland Trust Company ("Rockland"). Subsequently, members of the Donoghue family conveyed the Property by Quitclaim Deed to Mills and Richardson as joint tenants with right of survivorship for a stated consideration of $675,000.00. On January 13, 2003, the Deed was recorded at the Plymouth County Registry of Deeds. Mills and Richardson obtained title to the Property using the proceeds of the $540,000.00 loan from Rockland which was secured by a mortgage on the Property, together with approximately $135,000.00 in cash disbursed to the sellers by Mills, using some of the proceeds from Richardson's $200,000.00 check.

On January 1, 2003, prior to the date the title was registered, Mills and Dick Burbridge of Dick Burbridge Construction RSB ("Burbridge") executed "House Construction Contract," setting forth a construction cost of $495,000.00 and a 12 month period for completion of construction. Mills testified that he solicited other bids but that they were "quite a bit higher" than the initial proposal submitted by Burbridge.[3]

---

[3] Mills received a bid for the Project from Avila Construction in the sum of $714,500.00, as well as a proposal, dated March 30, 2003, from Crowley Building Associates in the sum of $651,000.00. He also received a proposal from Kearns Construction Inc., dated December 2, 2001 setting forth a total cost of $696,650.00. In addition, Burbridge prepared

Eventually, Mills and Burbridge revised the construction cost of $495,000.00 upward to $646,050.00.[4]

Mills added to the initial project cost of $495,000.00 costs for demolition ($8,500.00), for a septic system ($25,000.00), and for removal of an oil tank ($4,500.00). Mills testified that he was aware of an underground fuel tank on the Property as part of his due diligence in purchasing it. He did not convey that information to Richardson. Mills obtained an estimate from Oasis Environmental Contracting Services, Inc. ("Oasis") for removing the tank. In the process of removing the tank, however, Oasis discovered that leakage from the tank had contaminated surrounding soils, adding a remediation expense to the original removal cost. Mills received an initial proposal from Oasis of $3,600.00, but that cost mushroomed to over $14,000.00 because of remediation costs.

On February 5, 2003, Mills, individually, and as Richardson's attorney in fact, executed an application for a construction loan from The Bank of Canton (the "Bank of Canton" or the "Bank"). In a letter, dated February 7, 2003, to Edward J. Gaughan ("Gaughan"), a Vice President at the Bank, Mills wrote: "Ideally, we would like to finance

---

a contract, dated April 5, 2003, setting forth a total construction cost of $695,000.00. That proposed contract was not signed.

[4] As noted above, the unsigned construction contract between Mills and Richardson on the one hand, and Burbridge on the other, set forth a total project cost of $695,000.00, which included an estimate for finished landscaping of $25,000.00. The executed contract, among other things, eliminated that cost and substantially reduced the estimate for "Kitchen/Pantry cabinets and appliances from $49,000.00 to $25,000.00. It is unclear from the record how much Burbridge was paid, although checks admitted into evidence establish payments totaling $17,025.00 in 2003 and 2004. Richardson testified that Burbridge required cash payments.

the full cost of the construction and would be amenable to having the current mortgage bought out, if necessary as there is an advantage to us by paying interest only during the construction period, which we envision would be no more than 12 months."   Mills represented to Gaughan that the Property was to be a "family home," and he also represented, untruthfully, both that it was to be an "owner-occupied family compound property" and that he and Richardson were brothers-in-law.   In the letter to Gaughan transmitting the construction loan application, Mills stated that the projected construction costs were going to be roughly $740,000.00 for a total investment of just over $1,400,000.00.   He also estimated that the finished house would have a value of between $2 million and $2.2 million.

On or about March 18, 2003, following receipt of an application for a construction loan from Mills, Gaughan sent Mills a loan-commitment letter in which the Bank of Canton agreed to loan Mills and Richardson $1,200,000.00 to finance the Project, subject to certain terms and conditions.   In the commitment letter, Gaughan set forth "the sole purpose" of the loan was "renovation of a residential home" and that the construction completion date was eleven months from the loan closing date. Mills, on behalf of himself, and as attorney in fact for Richardson, accepted the terms of the Bank's loan-commitment letter.

In his testimony, Gaughan explained the terms and conditions set forth in the commitment letter.   Specifically, the construction contract was to have a maximum fixed price of $770,000.00 and had to be submitted to the Bank and its counsel for approval at least 15 days before the closing.   Moreover, all change orders had to be approved by the

8

Bank. In addition, Gaughan testified that, once the loan was made, the terms and conditions of the loan would be monitored by the Bank, inspections would occur to make sure work was performed, and title to the Property was to be updated every time the Bank made a construction advance. By their acceptance of the loan commitment, Mills and Richardson agreed that if "the Borrower conveys, pledges, mortgages, assigns, or otherwise transfers any interest in the Mortgaged Premises to any entity, the Bank reserves the right to demand payment in full of the obligation due under the within loan arrangement, including without limitation, principal, interest, prepayment penalty, (if any), late charges, costs and costs of collection."

Approximately three months after the execution of the original contract with Burbridge, Mills and Burbridge, executed another agreement. In that agreement, dated April 7, 2003, Burbridge agreed "to assist in the General Contracting" and to obtain bids from two reputable subcontractors for each phase of the work. The agreement provided that "[o]nce a subcontractor has been chosen by Curt Mills, it will be his responsibility to deal with said contractor regarding any details of that phase of the house." Nevertheless, Mills agreed to pay Dick Burbridge, a fee of $25,000.00, payable in installments, as well as $38.00 per hour for manual labor performed by Burbridge Construction. In addition, Mills agreed to pay Dick Burbridge to inspect "work in progress" to insure the integrity of the work for an additional fee of $5,000.00.

On April 8, 2003, Richardson executed a second power of attorney with language identical to the one executed on October 21, 2002. Richardson subsequently provided the second power of attorney to Mills.

On the same day Richardson executed the second power of attorney, Mills emailed

Gaughan informing him that he would like to recover "soft costs" up front, and that he

would "need to have some allowance for the deposit being made to Burbridge," the

construction contractor Mills intended to employ to begin the Project.  Mills attached to

his email a chart with the following row headings: "Cost Estimates and Allowances,"

which included soft costs, as well as labor and materials, "Projected Cost," which set forth

the cost of each itemization of labor and materials, such as demolition and initial site

work, and foundation and framing, and "% of Loan."  Mills estimated the "soft costs"

would be $43,360.00, the total cost of labor and material to be $646,050.00 and the total

cost, including "soft costs," such as permits and loan costs, to be $689,410.00, requiring

an infusion of funds from Mills and Richardson of $29,410.00 to account for the

anticipated shortfall in construction loan proceeds ($1,200,000.00 - $540,000.00 =

$660,000.00).

On or about April 9, 2003, the Bank granted a $1,200,000.00 construction loan to

Mills and Richardson to be used to finance the Project.   On April 9, 2003, Mills,

individually, and as Richardson's attorney in fact, executed both a Term Note and a

"Commercial Mortgage, Security Agreement and Assignment of Leases and Rents" (the

"Mortgage") in favor of "The Canton Institution for Savings, The Bank of Canton," to

secure the $1,200,000.00 construction loan given in support of the Project.  The Term Note,

despite the denomination of the Mortgage as a "Commercial Mortgage," provided that

"[t]he Borrower represents to the Bank that the proceeds of this Note will not be used for

personal, family, or household purposes." Pursuant to the Mortgage, Mills and

10

Richardson agreed not to "[s]ell, convey, assign, transfer, mortgage, pledge, hypothecate, lease or dispose of all or any part of any legal or beneficial interest in the Mortgage or the Property or any part thereof or permit any of the foregoing, except as expressly permitted by the terms of this Mortgage" and without the express written consent of the Bank.  In addition, they agreed to keep the Property insured, to maintain complete and accurate books and records in accordance with generally accepted accounting principles and to permit the Bank to inspect those records.

On April 9, 2003, Mills, individually, and as Richardson's attorney in fact, also executed a Construction Loan Agreement with the Bank, which set forth a completion date of March 9, 2004.  That agreement contained a provision requiring Mills and Richardson to deposit funds with the Bank in the event the Bank, "in its reasonable discretion," determined that the remaining undisbursed loan funds "is or will be insufficient to complete and equip fully the improvements in accordance with the Plans and Specifications." Consistent with that provision, the Construction Loan Agreement precluded Mills and Richardson from causing or permitting deviations from the specifications and approving change orders that would result in the increase of any line item in the Project budget without prior Bank approval.

Mills used approximately $540,000.00 of the $1,200,000.00 construction loan to discharge the $540,000.00 Rockland mortgage.  Mills, however, also used some of the checks issued by the Bank of Canton on the construction loan to disburse money to "MaxLax Lacrosse," "MBYLL" a/k/a Mass Bay Youth Lacrosse League, "Cohasset Youth Lacrosse," and "Fleet Bank," as well as in support of the Project by disbursing money to

11

various sub-contractors and tradesmen.[5]   He also disbursed at least $460,550.00 of construction loan proceeds using checks payable to "Cash," which he endorsed.[6] Additionally, on April 11, 2003, he, and as Richardson's attorney in fact, executed a "Fleet Line Agreement" purportedly giving Fleet Bank a mortgage on the Property to secure a $70,000.00 line of credit in the parties' names.    Fleet Bank did not record the mortgage. Mills disbursed at least $100,500.00 on the Fleet line of credit using checks payable to "Cash," all of which he endorsed.[7]  Mills did not inform Richardson that he had applied for a line of credit, and Richardson testified that he was unaware of the Fleet line of credit when Mills applied for it, and Mills did not inform the Bank of Canton that he had obtained it.   Mills continued to make payments to Fleet, and its successor, Bank of America, even after the Property was sold on April 15, 2005.

Gaughan testified that the decision to obtain the line of credit violated the Construction Loan Agreement and that the Bank "would have stopped our process right then and there and demanded the note. . . ."  He also testified that if the Bank had seen the checks payable to "MaxLax Lacrosse," "MBYLL" a/k/a Mass Bay Youth Lacrosse

---

[5] Although the parties agreed that Mills used checks issued by the Bank of Canton on the construction loan to disburse monies to MaxLax, the actual dates and amounts of the disbursements were not submitted into evidence.

[6] This fact was listed in the parties' Joint Pretrial Memorandum as one of the facts that were admitted and required no proof.   The Court assumes this sum includes the $360,000.00 counter check Mills obtained to pay Black Rock Development, Inc., which transaction is discussed below.

[7] The parties stipulated to this fact.

League, "Cohasset Youth Lacrosse," "we would have put the project on hold until we clarified what was going on."

With respect to the actual construction activities at the Property, in late August of 2003, Gaughan advised Mills to "watch your cost!!," while noting that $52,800.00 was available for funding. Gaughan added that "[y]ou will actually be funded about $30m [sic] [i.e., $30,000.00] ahead of work in place due to soft costs I've advanced for you." Nevertheless, email exchanges in late December of 2003 and early 2004 between Gaughan and Mills contained the first hints and then a recognition that the Project was beset with construction delays and cost overruns, such that, to paraphrase Mills, it had spun out of control. For example, in an email exchange between Gaughan and Mills on January 5, 2004, Mills indicated $257,000.00 was needed to complete the Project, although according to Gaughan, there was only "$242,000 left unfunded in the loan." In a February 12, 2004 email to Gaughan, Mills advised him that a "For Sale" sign had been placed on the Property.[8]

Although the completion date of the Project was March 9, 2004 as set forth in the Construction Loan Agreement, the Project was incomplete at that time. In an email dated

---

[8] In an April 9, 2004 email, Mills advised Gaughan that he had been "negotiating with a couple in Cohasset that need[ed] to sell their house as part of the deal. . . . The[ir] offer [wa]s for just over $ 2MM." On or around March 29, 2004, Barry and Margaret Tufts sent Mills an offer to purchase the Property for $1,900,000. Mills rejected the offer, advising Gaughan on May 5, 2004 that the sale price should be at least $2.1 million. In his email, he also identified "expenses" as "already finished/incurred or immediate in nature": $8,100 for "DB&S Lumber"; $6,275 for "Decking (so far); $7,780 for Plumbing Fixtures"; and $12,000 for "Rough Plumbing." He requested the bank's "help" with funding them, adding that he had "taken care of the other deposits and put off the appliance purchases."

April 6, 2004 to Gaughan, Mills stated that he had received "a notice from the bank stating that the entire note balance is due and while it is certainly hard to ignore that large a number, I assume that is what I am supposed to do with this until we get it officially extended – correct?"  Gaughan replied noting that he planned to seek a 60-day extension of the Project, adding that "[b]y then I hope to see significant construction progress as well as an exit plan . . . ."  He concluded by advising Mills that he "really need[ed] to crack the whip" with subcontractors.  Gaughan also testified that if Mills had obtained an offer for the Property, the Bank would have been amenable to it as the Bank "wanted to get paid off."  Indeed, at the time, Mills advised Gaughan that he was negotiating the sale of the Property which had been listed with a broker.  The offer was not forthcoming in April of 2004.

Approximately one year after the projected completion date, Mills sought additional monies for the Project from Richardson.  In early April of 2004, Richardson sent $45,000.00 to Mills, which Mills repaid on or about June 5, 2004.

Mills sent Gaughan an email on August 12, 2004 with respect to an interest payment that he ostensibly mailed from his lacrosse summer camp at the end of July.  In the email he represented that "the central vac [was] put in at a cost of $2,024.00. . . ."[9] He also represented that he was "90% committed to another contractor who [wa]s putting together a finite budget for completion and a time frame that w[ould] get [the Project] done before the end of September."

---

[9] As noted below, Electrolux was paid $1,059.99 at the April 15, 2005 closing.

Two days later, on August 14, 2004, Mills advised Gaughan that he had terminated Burbridge and finalized a contract with J. Read Corp. of Hingham, Massachusetts, whom he stated "specialized in the high end market." Mills told Gaughan that J. Read Corp. would be able to complete the Project by October 1, 2004 at a cost of between $240,000.00 and $265,000.00, a figure comparable to the cost to complete that Mills had set forth in his email dated January 5, 2004.[10]  Mills also advised Gaughan that the new contractor had been the contractor for luxury homes built at the Black Rock Country Club[11] and was engaged "to do the build out of our new building in Pembroke (commercial) so they [sic] have a vested incentive to make sure that they deliver."  He informed Gaughan that J. Read Corp. would "manage the entire process from here on" and that he had switched realtors "to give some fresh blood and excitement." He requested the Bank consider funding the additional amount needed to finish the Project "based on this contract price [i.e., $240,000.00-$265,000.00] and the assurance that it will be "completed by 10/1/04 and by that time . . . we will either have it under agreement or will re-fi to take it off your books. . . ."

---

[10] Mills indicated that Crowley Building Associates and Kearns Construction Inc. also "did various phases of work, some to keep it going, some actually, hopefully finish [sic] it so we could sell it."  Those entities, which appear to have submitted bids prior to the construction loan, ostensibly performed work after Mills terminated Burbridge.  Mills testified that he paid Crowley's subcontractors in cash.  There were no invoices from, or checks to, either of those entities, however.

[11] As will be discussed below, McGoldrick, the principal of Black Rock Development, Inc., developed the Black Rock Country Club.  Accordingly, the Court infers that he knew the principals of J. Read Corp.

On September 6, 2004, Mills sent an email to Richardson with the following subject: "Benefit to Burden."  In the email, Mills observed: "Though it is a statement of the obvious, this thing has turned sour as a day to day project that should be something to celebrate over champagne and not have to wash down with rotgut."  In the email, Mills admitted to poor project management and a cost overrun of about $135-150,000.00, stated that he was "trying to raise some additional funds on my own (in addition to what I have already put in)," and revealed that "my dilemma is that my business has taken a major growth step and we bought a building over the summer that we are turning into an indoor family recreational center that will host my lacrosse programs as well as many other activities."  He added that he has "sunk about $400K into this already and am looking at another $300K before it is finished."  As a result, Mills asked Richardson for his help in getting additional funding, as well as his "direct input and involvement with the contractor, bankers, brokers, etc."  He stated that "it is a pretty safe bet that we can make any additional investment a VERY short term one with money coming back to you by no late [sic] than the end of October."  He explained that $75-85,000.00 was needed but "$44K of it that could really be used right now to take some of the heat off."  Nevertheless, he advised Richardson to "[k]eep the faith" as he anticipated finishing and selling the Project in November.  He also reassured Richardson that his original investment was not in jeopardy.

Richardson responded to Mills's email on the same day, i.e., September 7, 2004, requesting "cash flow for the project to date" and contact information for the banker, contractor and broker for the Project.  Richardson observed that that information would

16

enable him to "determine if it's worth selling asset [sic] to add funding."   Richardson
explained that his email was intended to convey his wish to be more involved - - to
examine and to execute documents for himself.  He also indicated that he did not expect
that the Property would be sold without his knowledge or signature.

Mills, in turn, sent a reply email on the same day, setting forth "Current
Construction Notes" of $1,270,000.00, which included the Fleet line of credit, and "Total
Funds Invested" of $1,700,000.00, including $200,000.00 from Richardson and $80,000.00
of his own funds.  Mills projected a gross profit of $300,000.00, based on those figures as
well as the infusion of an additional $150,000.00 of which $56,000.00 would be obtained
from the Bank of Canton.   In addition, Mills offered "to remit a reasonable (or
unreasonable) interest rate on the extra monies that you may put in from my share of the
profits so that if you do need to liquidate some holdings, you will not lose anything on it
for the short term use of the funds."  He concluded his email with the following:  "Just
remember, you are my brother-in-law with the bank and others – though I'm feeling a lot
like the black sheep right about now."

Richardson responded:  "I wish all this made me feel more positive, but it hasn't."
He reiterated his request for cash flow information, as well as information about the
banker, contractor and broker so he could determine whether to sell assets to add
funding.  Richardson was in Massachusetts at the time he sent his reply email to Mills as
he concluded his email by stating:  "Off to ride mopeds around Nantucket."  Despite his
expressed desire to be more involved, however, Richardson admitted that he had only
one conversation with Gaughan, from which he concluded that the Project was "[b]ehind

schedule, over budget, but still viable." Richardson never had any conversations with brokers or contractors.

On or about September 22, 2004, Richardson provided Mills with a signed check, number 1002, drawn on Richardson's Fidelity Investments account, which listed "Curt Mills" as the payee, and $115,000.00 as the amount payable. Mills received, endorsed, and deposited that check from Richardson.

At about the same time Mills was seeking additional funding from Richardson in the late summer of 2004, he was in contact with George McGoldrick ("McGoldrick"), President of Black Rock Development, Inc. ("Black Rock"), a real estate development company which had been involved in the development of the Black Rock Country Club. In McGoldrick's words, Black Rock was "a one-man shop." Mills testified that he sought funds from McGoldrick "in support of the Glades Road project." McGoldrick testified that he received the following chart from Mills containing the following information about the "Scituate House":

| First Mortgage | 1,200,000 | | Bank of Canton |
| Left to Draw | | 105,000 | |
| Additional Line | 70,000 | | home equity |
| *Cost to Complete* | *150,000* | | |
| Equity In | 300,000 | | |
| | | | |
| Total | 1,720,000 | | |
| Total Secured | 1,200,000 | | |

(emphasis supplied).

On September 8, 2004, McGoldrick sent a letter to Mills at MaxLax outlining a proposal to provide interim equity funding to MaxLax in the sum of $350,000.00 for a

18

period of between 60 and 90 days "*for the completion of its Oak Street, Pembroke facility*" (emphasis supplied). The terms of the loan included an annual interest rate of 12.5% on funds disbursed; a minimum interest rate of 7.5% as a "Use of Funds" fee; a second mortgage on the Property, and a security interest in equipment. On September 28, 2004, Mills, as manager of MaxLax, executed a $350,000.00 term note in favor of Black Rock. The note provided for monthly interest payments, as well as payment of all principal and accrued interest on or before March 28, 2005. In addition, on the same day, Mills, individually, and as attorney in fact for Richardson, executed an unlimited guaranty of the obligation owed by MaxLax to Black Rock, as well as a Mortgage and Security Agreement on the Property to secure the $350,000.00 note. The mortgage was notarized by Bruce Issadore, Esq. ("Attorney Issadore"), Black Rock's attorney.

McGoldrick advanced funds to MaxLax via two checks: an official Banknorth, NA. check in the amount of $295,000.00, dated September 16, 2004, prior to the execution of the note and mortgage, and a personal Foxborough Savings Bank check in the amount of $55,000.00, dated September 29, 2004. Both checks were deposited into the same account ending in ******019 at Rockland in the name of "MaxLax Lacrosse."

On October 18, 2004, Attorney Issadore, by means of facsimile transmission to Mills, indicated that "[t]he land court has refused to record the mortgage because of the age of the POA you hold for your partner. I will need either a new POA or an affidavit signed by him, stating that the POA is still in full force and has not been modified." Attorney Issadore testified that he never received an affidavit or a new power of attorney. The mortgage intended to secure the guaranty of the $350,000.00 loan from Black Rock to

19

MaxLax was never recorded either through oversight or design.  Recordation of the mortgage would have, in Mills's words, "trip[ped] up" a potential refinancing of the Property and prevent the requested $56,000.00 in construction loan proceeds.

On October 1, 2004, Richardson emailed Mills, indicating an intention to send information directly to the Bank of Canton, as he "need[ed] to be involved in [the] future of the project."  He stated unequivocally:  "Any loan documents or any other documents for this that require my signature, I will sign for personally."  He added:  "Please stop asking me to just send you financial information.  I'm very uneasy about the future of this project and I need to know whats [sic] going on.   Seeing the property was helpful but now that i've [sic] committed more capital, I'm that much more worried."[12]

Mills testified about his understanding of Richardson's email, stating that he and Richardson were having numerous conversations at the time about refinancing the Project and that Richardson was considering refinancing the Project "through his own channels."  He stated that it was "absolutely not" his understanding that Richardson revoked the power of attorney, despite Richardson's statement:  "Any loan documents or any other documents for this that require my signature, I will sign for personally."

The October 1, 2004 completion date Mills referenced in his email of August 14, 2004 email to Gaughan and the mid-October completion date Mills referenced in his September 6, 2004 email to Richardson came and went.  In an email from Mills to Richardson, dated October 2, 2004, Mills discussed a refinancing option with the Bank of

_____

[12] The Court presumes that Richardson viewed the Property in late August or early September around the time he was in Massachusetts and visiting Nantucket.

Canton.  On October 22, 2004, Mills indicated, based upon a proposal from J. Read Corp., that $243,500.00 was needed to complete the Project, a sum which included $90,000.00 remaining on the construction loan, a loan increase of $56,000.00 and "Additional Owner Funds" of $97,000.00.  Gaughan testified that the Bank was concerned that there was insufficient money "between bank money and borrower money" to finish the Project. The Bank, however, after the completion of some work by J. Read Corp., increased the loan by $56,000.00 and extended its maturity date.  The Bank also provided Mills with $26,520.00 of the $40,800.00 he requested in late October of 2004.

J. Read Corp. performed work on the Project, invoicing "MAX LAX Lacrosse Programs" on October 13, 2004 for $32,520.00, based upon a total Project cost of $248,412.50 due to approved change orders, and, on March 4, 2005, for $18,970.00 on top of a $24,000.00 deposit.[13] Notably the proposal prepared by J. Read Corp. was dated October 13, 2004, the same date as the first invoice.  Mills testified, however, that the money obtained from Black Rock (i.e., $388,000.00 in total) was used to pay J. Read Corp. for work on the Project.  He further testified that none of the monies were used to pay J. Read Corp. for work performed at MaxLax's Pembroke facility.  If Mills were to be believed, he paid J. Read Corp. at least $278,770.00, an amount in excess of its original estimate of $243,312.50.  Invoices from J. Read Corp. contain the reference "Bill To:  MAX

---

[13] The October 13, 2004 proposal submitted by J. Read Corp. included insulation.  Indeed, the first invoice from J. Read Corp., dated October 13, 2004 included a line item for insulation in the sum of $11,450.00 with the notation that the job was completed. Nevertheless, Mills testified that he paid monies to Anderson Insulation on November 6, 2002 in the sum of $630.00 for insulation.

LAX Lacrosse Programs, Attn: Curt Mills." Mills signed checks from MaxLax 's account at Rockland on September 17, 2004 in the sum of $100,770.00, just three days after Mills deposited McGoldrick's $295,000.00 check to MaxLax, and on October 4, 2004 in the sum of $100,000.00. These two dates precede the date of J. Read Corp.'s proposal. Mills also signed checks on November 2, 2004 in the sum of $33,000.00, a payment corresponding to J. Read Corp.'s first invoice for the Project which indicated that 13% of the work was completed; on November 11, 2004 in the sum of $15,000.00; and, on May 17, 2005, following the April 15, 2005 sale of the Property, in the sum of $30,000.00. The check dated May 17, 2005 contained the memo, "1st Payment – Settlement." Although J. Read Corp. performed work at the Project and for MaxLax, Mills testified that he did not believe any of the $30,000.00 payment related to work at MaxLax, although the payment was made from MaxLax's Rockland account. The $30,000.00 check was returned for insufficient funds, and, on May 20, 2005, Mills signed a check in the sum of $30,075.00 payable to cash with the memo: "Replacement Payment J. Read." With the cash, Mills obtained a treasurer's check in the sum of $30,050.00 with the notations "Scituate House Work."

On December 7, 2014, McGoldrick advanced an additional $38,000.00 to MaxLax via a personal Foxborough Savings Bank check. That sum was deposited into MaxLax's Rockland account ending in ******019. A Funding Agreement bearing the same date and providing for an extension of the agreement for an additional fee of 7.5%, or $2,850.00, and repayment prior to January 1, 2005 was not executed.

22

At the end of February 2005, the Project remained unfinished, and the Bank had sent Mills and Richardson a reservation of rights letter.   Nevertheless, the parties contemplated a further loan extension, the fourth, as Mills had employed a new construction company, Oceanside Builders owned by Douglas Karo ("Karo").   In a February 23, 2005 "Construction Loan Extension Update," Gaughan noted that, on January 31, 2005, NE Capital Mortgage Co. had agreed to grant Richardson $1,350,000.00 in permanent financing on the Property in the form of a first mortgage in the sum of $1,200,000.00 and a second mortgage in the sum of $150,000.00, but this financing was not consummated.   Mills obtained the financing using the power of attorney from Richardson.  Gaughan noted that the contract with Oceanside Builders was for $85,000.00 for completion of interior work and that $186,600.00 would be needed to complete the Project.  The Bank extended the maturity date of the loan to March 31, 2005.

The Property was eventually sold on April 15, 2005.  Mills testified that during the course of construction he employed "[m]aybe half a dozen" contractors and that he employed "interim contractors that would come in and do some work that I had to pay mostly in cash to get them to come."[14]   In a Construction Loan Extension Update, Gaughan indicated that he had spoken with Karo who represented that the original

---

[14] During his testimony, Mills indicated that he paid, either by check or in cash, at least $27,500.00 to Avila Construction, an entity which he testified was related to the original contractor, Burbridge.   Avila Construction submitted a bid referencing "Burbridge Quotation (Primary Construction Only)" of $495,000.00 and submitted additional cost items for demolition, septic system installation and other work totaling $165,500.00 and additional allowance items for kitchen cabinetry, appliances, masonry and fixtures totaling $54,000.00.

contract for completing the home was for $85,000.00, although that figure skyrocketed and Oceanside Builders was paid $42,000.00 prior to the April 15, 2005 closing; $168,874.00 at the closing, which was secured by a mortgage, and $25,000.00 after the closing from an escrow account funded by money from the buyer's deposit, for a total of $235,874.00.

With respect to the sale that took place on April 15, 2005, on March 20, 2005, William B. Bannick ("Bannick") executed a written "Offer to Purchase Real Estate," in which he offered to purchase the Property for $2,200,000.00.  On April 3, 2005, Bannick executed a revised written "Offer to Purchase Real Estate," in which he reduced his offer to $2,022,000.00.  On April 11, 2005, Mills, individually, and as Richardson's attorney in fact, agreed to sell 49 Glades Road, Scituate, Massachusetts to Bannick for $2,022,000.00.  Mills signed Richardson's name as his attorney in fact.  An Addendum to the Purchase and Sale Agreement provided that Bannick was purchasing the Property "as is" and that "[a]ll permits, approvals and warranties relating to construction at the subject premises shall be assigned by Seller to Buyer" and "Seller shall, at or before time of closing [sic] pay in full all outstanding charges owed to contractors, material suppliers, or any other creditor with respect to the construction at the subject premises."  In addition, Mills agreed that wood and tile flooring would be installed in certain areas and that the Seller would complete installation of the HVAC system and a central vacuum system or monies for those purposes would be withheld from the Seller's proceeds.  In addition, the leaks affecting a large front window would be repaired.  Finally, the parties agreed that "[a]t time of closing, there shall be withheld from Seller's proceeds sums sufficient to satisfy

all outstanding invoices owed to contractors, including Oceanside Builders and DB&S Lumber and Home Improvement Centers ("DB&S").

In preparation for the April 15, 2005 closing, Mills admitted sending a letter to a real estate broker named Ellen, whom he conceded "possibly" was Ellen Goldenson. In the letter, Mills indicated that he was sending copies of the power of attorney for his "brother in law," i.e., Richardson, and identified payments that would have to be made to, among others, Alvin Hollis and Electrolux. In addition, he stated: "If Bill B. [Bannick] would prefer to just write a check made payable to me I will get it from you when I sign it and then have it deposited into escrow from there as I have to see my attorney in the morning anyway. Whatever he thinks is easier."

Mills testified that he communicated with Richardson about the purchase and sale agreement and the ultimate sale of the Property. Moreover, he testified that Richardson did not object to the use his signature pursuant to the powers of attorney. Richardson testified to the contrary, stating that he was unaware of the sale. He was not involved in negotiating the Purchase and Sale Agreement and did not attend the closing.

As required under the Purchase and Sale Agreement, Bannick, the purchaser, made a deposit of $101,100.00; from that sum $96,100.00 was held in escrow, and $5,000.00 was given to Mills. Mills, individually, and as Richardson's attorney in fact, executed a deed transferring title of 49 Glades Road, Scituate MA from Curt Mills and Andrew Richardson to Bannick for $2,022,000.00 on April 15, 2005. The deed was recorded at the Plymouth County Registry of Deeds on the same day. The Settlement Statement shows the payoff of two mortgages: one held by the Canton Institution for Savings in the

25

amount of \$1,219,326.82,[15] and the other held by Douglas Karo of Oceanside Builders in the sum of \$168,874.00.   In addition, the following entities were paid from the sale proceeds: Kethro and Thomas, P.C., Electrolux, Alvin Hollis, a HVAC contractor, and DB&S.

On April 15, 2005, Mills received a check for the net proceeds from the sale of the Property. The check was in the amount of \$479,079.27 and was payable to "Curt Mills and Andrew Richardson." That same day, Mills deposited the check into MaxLax's Rockland checking account number ******0019.   On April 14, 2005, the day prior to the sale of the property, the balance for MaxLax's Rockland checking account number ******0019 was - \$123.57.   On April 15, 2005, Mills also received treasurer's check 203293 from Hingham Institution for Savings for \$22,685.00 in excess-deposit proceeds, payable to him and Richardson.   Mills deposited the Hingham Institution for Savings treasurer's check 203293 into his Fleet account number ******9262.   Thus, Mills received settlement proceeds totaling \$501,764.27.

On April 27, 2005, Mills paid Black Rock \$360,000.00 using funds from MaxLax's Rockland checking account number ******0019.   No portion of the sale proceeds was used to satisfy the outstanding balance on the Fleet credit line.[16] In addition, Mills paid off his personal credit cards out of the proceeds from the sale of the Property.

---

[15] Mills did not draw down the full \$1,256,000.00 on the construction loan.

[16] According to Richardson, with the exception of a September 21, 2005 charge from Walter J. May Insurance, there were no Project-related expenses after the closing that were not covered by the \$25,000 escrow account and the \$168,874.00 paid to Karo and Oceanside Builders out of the closing proceeds.

Richardson, as noted above, testified that he was unaware of the Purchase and Sale

Agreement, and Mills did not inform him of the sale.  He testified that he only learned

that the Property was sold in early 2006.  Mills testified that he believed that he had

informed Richardson that he sold the Property, but produced no evidence that he notified

Richardson of the date and location of the closing or forwarded him a copy of the

Purchase and Sale Agreement or Settlement Statement.

On January 11, 2006, approximately nine months after the April 15, 2005 closing,

the Law Offices of Samuel A. Persaud, P.A., located in Miami, Florida, sent Mills a letter

on behalf of Richardson.  One of the firm's attorneys, Stuart J. Nunez, Esq., wrote the

following to Mills:

> The undersigned law firm represents Andrew S. Richardson.  Upon
> reviewing our client's financial affairs, we have learned that our client made
> an investment towards the construction and/or rebuilding of the Property
> listed above.  Therefore, please provide a status update on the completion
> of said Property.
>
> Additionally, we have been advised that our client may have executed a
> Power of Attorney in favor of Charles Curtiss [sic] Mills.  This shall serve
> to confirm that our client has elected to terminate all Powers of Attorney.
> Therefore, if you possess a Power of Attorney for Mr. Richardson, please
> provide the original Power of Attorney to this office of the undersigned.

Mills responded on January 24, 2006 by email to Attorney Nunez.  He stated:

> I received your letter upon return from a business trip last week regarding
> the status of the real estate investment and in response the town issued a
> temporary Certificate of Occupancy for the premises on 12/28/05 after
> obtaining the required signatures from the town inspectors . . . and it is my
> understanding that this is valid for a 3 month period while final
> repairs/renovations are being completed pending final inspection.  I have
> been unable to determine if anyone has moved into the premises, but there
> is apparently ongoing work continuing.  We have warranty responsibility

for the "as is" portion of the structure thru the middle of April. *We are
pursuing the release/repayment of the funds in question.*

As I have not used, nor had reason to use, the referenced POA for almost a
year, I will look for the original in my records and return it to you under
separate cover. This will also serve to confirm that I acknowledge that said
POA has been revoked and it's [sic] use is no longer authorized by your
client.

(emphasis supplied). Mills did not inform Attorney Nunez that the Property had been

sold and that he had received in excess of $500,000.00 in proceeds from the sale. Mills

testified that the release of funds related to "a significant hold-back on the repair and

replacement of the window in entirety." Nevertheless, he admitted he paid the Black

Rock note and he made payments under the Fleet line of credit "until Mr. Richardson

opted to pay it off."

In preparing his 2005 tax returns, Mills, in October of 2006, communicated with

his accountant, Timothy MacLellan, CPA ("MacLellan"), who was associated with the

firm of Morgan & Morgan, P.C. MacLellan advised Mills that he needed to review the

cost basis for the Property. In response, Mills prepared a table (Plaintiff's Exhibit 29)

showing the sale price of $2,022,200.00, less $23,938.00 for repairs), resulting in net

proceeds of $1,998,062.00; the purchase price of $675,000.00; construction costs, including

certain soft costs, house construction costs of $1,219,327.00 (i.e., the pay off to the Bank of

Canton at the closing);[17] and capitalized costs, including mortgage interest, totaling

$143,827.00. He calculated a total cost basis of $2,069,823.00, resulting in a loss on the sale

of $71,221.00. In a previous iteration of this document, which MacLellan did not use to

---

[17] Richardson only disputes the $1,219,327.00 figure for "House Construction."

28

prepare the 2005 return, Mills set forth interest, costs and fees owed to Rockland, the Bank

of Canton, and Fleet (identified as "Bank of America HE"); an initial cash investment of

$315,000.00 (from Richardson), "Additional Cash in Misc" of $16,615.00, as well as

proceeds received from the sale, comprised of an escrow deposit balance of $22,385.00

and net proceeds of $479,079.00. He also indicated that $23,938.00 was attributable to a

"Pending Payable/Warranty" and a "Net Loss on Investment" of $67,915.00.  There was

no reference to the Black Rock note of $350,000.00 or his personal infusion of cash which

he estimated to be $150,000.00, in either document.  Similarly, there was no information

included with respect to Mills's credit cards which he claimed he used for Project

expenses or the $5,000.00 deposit he received.

The Debtor's 2005 federal tax return was audited by the Internal Revenue Service

("IRS"). In December of 2008, the IRS advised Mills and his spouse that although it made

changes to their return, those changes did not affect their tax obligation as reported on

the return.  Between the filing of the 2005 tax return and the notification that there would

be no changes to it, Mills closed the MaxLax facility in the spring of 2007.

On April 11, 2007, Mills emailed Samuel A. Persaud, Esq., stating:

> I apologize, but I just have not had the opportunity to summarize [the
> records on the Project] into anything coherent though I have compiled all
> of the original records from the banks, contractors, tax statements, etc., to
> validate the expenditures and the losses with a cost basis of $2,093,221
> (including Andy's investment of $315,000) and a net sell price of $1,850,000
> less $69,740 in holdbacks and warranty coverage.

In other words, Mills was reporting a Project loss of $312,961.00 ($1,850,000.00 - $69,740.00 - $2,093,221.00 = -$312,961.00), not $71,221.00.  He added:  "I would waive any joint rights to the losses if it would enhance [Richardson]'s tax benefit."

On May 17, 2007, Attorney Persaud wrote Mills regarding Richardson's investment of "$315,783.76 in a joint venture," observing that Richardson had received no return on his investment and noting that Mills had failed "to provide Mr. Richardson with any documents showing how his funds were expended, the status of the joint venture and an accounting for the profits and/or loss of the joint venture."  Attorney Persaud also demanded that Mills "immediately satisfy the . . . Credit Line and provide a copy of the Satisfaction of Mortgage."

Approximately three months after receipt of the letter, Mills, on August 3, 2007, emailed Richardson setting forth a litany of woes, together with statements as to his understanding of why the Project failed, ruining both his financial and physical health. He stated that he thought that by hiring J. Read Corp for both the Project and the build out of the MaxLax sports facility he could obtain leverage over the company but, in fact, "they [sic] got more leverage over me and were able to screw me twice."  He added:

> Unfortunately after I fired them from the house project I got into a nasty legal battle with them over excessive charges for the facility (double the original budget of $450k ! !), so when I told them to go take a hike they managed to get liens on all my personal and business assets including the Scituate house saying I still owed the $$ for work they never did.

He also informed Richardson that he lost his business and "was evicted from the building that I spent so much . . . [expletive deleted] . . . money to create in the first place."

Richardson responded sympathetically the same day.  He stated:

This just didn't work out at all. I had pretty much assumed that my original investments weren't coming back but I guess since apparently I cosigned the line of credit with Bank of America, I'll have to pay that off as well or my credit will turn to . . . [expletive deleted] . . . as well. So I guess that is my final question, do I have to pay off the line of credit. The paperwork showing where all the money went is going to be required for the impending IRS audit that I will have when I try to deduct all of this as a bad investment so, yes, please send all paper trail materials to me so I can fight the battle that I'll be stuck with. Please do send the papers, though, so I don't have to have another lawyer breathing down your neck just for documentation.

Richardson, on August 20, 2007, on October 30, 2007, and again on November 8, 2007 wrote checks to Bank of America, Fleet's successor. The August check was in the sum of $2,983.55, the October check was in the sum of $1,800.96, and the November check was in the sum of $70,014.22 and satisfied the line of credit.

C. The Scituate Project: Construction Costs

During his testimony, Mills identified invoices and estimates from contractors and suppliers of materials for the Project, including Anderson Insulation Company, Incorporated, DB&S, which Richardson concedes was paid $126,925.83,[18] Electrolux L.L.C., Jody F. Kehoe Excavating Corp., August West Chimney Company Inc., Leo Collins, a framer, Artimis Bowen, Inc. d/b/a Home Clearinghouse, a real estate broker, Old England Paint, and Robbie Fuels Inc., a HVAC contractor. In addition, Mills submitted, as Defendant's Exhibit 10, a summary of invoices reflecting total charges of $540,926.03 to contractors and service providers by means of checks or cash payments,

---

[18] The Debtor submitted an exhibit setting forth DB&S invoices, totaling $123,288.64, and checks showing payments of $109,325.83. DB&S was paid an additional $17,600.00 at the April 15, 2005 closing. It also submitted a quote for $33,100.00.

31

some of which contain notations referring to check numbers and amounts paid.  That exhibit included $151,668.58 paid to Oceanside Builders.  The parties stipulated, however, that Mills made payments to Oceanside Builders in the total amount of $235,874.00.

In addition, Mills submitted a chart, summarizing alleged payments to contractors and suppliers, as well as checks made payable to cash, and payments to the Bank of Canton, Fleet Bank, and credit card companies set forth in Defendant's Exhibit 11.  These payments allegedly reflect total Project expenses of $1,259,407.71.  Mills testified that he used his personal credit cards to obtain services and supplies and paid the balances with monies obtained to fund the Project.  Indeed, the account number ending in ******0392 appearing on Mills's personal check from Fleet Bank made payable to American Express Centurion Bank is the same as the account number for a personal loan from Ameriprise Financial appearing on Schedule F-Creditors Holding Unsecured Nonpriority Claims filed in Mills's bankruptcy case.  Nevertheless, Mills could not link credit card purchases to the Project.

Mills wrote checks payable to cash on MaxLax's Rockland account and his Fleet account.  Specifically, Mills, as set forth on the chart summarizing Defendant's Exhibit 11, wrote checks to cash on the Fleet account in 2003 and 2004, totaling $36,670.47; he wrote checks to cash on the Rockland account in 2004 and 2005, totaling $52,390.00.[19]  Two of the Rockland checks were written after the closing:  one on April 18, 2005 in the sum of

---

[19] For example, Mills wrote a check for cash in the sum of $3,304.00 on July 11, 2003 which was for a building permit from the Town of Scituate.

$5,000.00 and the other on May 20, 2015 in the sum of $30,075.00.  The $30,075.00 check

contained the notation "Replacement Payment."[20]  Mills also wrote a $14,000.00 check for

cash on September 20, 2004 on a Bank of Canton account in his and Richardson's names.

Mills explained the checks written to cash as follows:

> Largely because the -- many of the contractors we were dealing with either
> -- either needed cash or demanded cash or there were multiple contractors
> or multiple payments that needed to be made and so I used a -- used a
> group of cash rather than doing multiple checks.

The testimonial and documentary evidence established that Mills attempted to act

as the general contractor for the Project and that the Project was beset with problems from

the outset, including leakage from an underground fuel tank which contaminated the

surrounding soil, requiring more extensive and expensive work than initially

contemplated before construction of the new dwelling even began.  Mills was

incompetent to act as a general contractor, lacking the requisite skill and experience.  He

failed to keep adequate books and records of the work performed and payments made to

contractors, subcontractors and suppliers.  Not only did this dereliction breach the

Construction Loan Agreement with the Bank of Canton, it invited more egregious

behavior.  In reviewing invoices and checks, many of which, as noted above, were made

payable to cash, and allowing for the passage of time, Mills, in his testimony, had

difficulty recollecting the type of work performed, and the materials provided, by the

numerous contractors, subcontractors and suppliers involved with the Project.  He,

---

[20] The parties in their Joint Pretrial Memorandum agreed that Mills disbursed at least
$460,550.00 of the Bank of Canton construction loan proceeds using checks payable to
cash.

nevertheless, insisted, incredibly, that all checks and payments set forth in Exhibit 11 to

various entities and individuals were for work performed on the Project.  Moreover, he

testified that he paid a number of individuals or entities, but produced no evidence of

actual payments.  The conclusion is inescapable that numerous workers and contractors

were engaged to do the same work, either because the original work was unfinished or

defective, or costs attributable to the Project were for work performed for MaxLax as Mills

admitted that he was expanding that business at the same time he was attempting to

oversee the Project.  He attempted to explain by stating that "there was a lot of finger-

pointing going on and who did what and we ended up paying for it."  His explanation

fails to account for the substantial payments he attributed to the Project for which he

failed to produce any corroboration of actual payment.  His testimony lacked credibility.

Exhibits submitted into evidence revealed questionable payments unrelated to the

Project.  For example, Mills wrote five checks to Walter May Insurance, Inc., totaling

$13,044.00.  Mills described the company as one that "would go ahead and insure the

workers, like Workers' Comp, things of that nature, on the job, as well as they [sic] would

provide subs for the flood insurance, the home insurance, homeowners loss -- against

losses and we pretty much allowed them to go ahead and propose what we needed to

make sure that the house was covered . . . ."  That explanation was both incoherent and

puzzling as Workers' Compensation insurance would be paid by the contractors on

behalf of their employees, not by Mills. Moreover, Mills paid another insurance company,

Commerce Insurance Company, $1,176.34 from MaxLax's Rockland checking account

"for something to do with the - - with the house insurance."

34

On cross-examination, Mills also was questioned extensively about payments made to all contractors and suppliers to whom checks were issued or who submitted estimates or invoices to Mills, including Kearns Construction Inc. and Crowley Building Associates. Some exhibits were merely proposals, which this Court concludes Mills did not accept, such as those submitted by Kearns Construction, Inc., Crowley Building Associates, August West Chimney Company, Jody F. Kehoe Excavating Corp., Old English Paint, and Robbie Fuels, Inc. Although Mills testified that they were paid, he did not have checks showing any payments. He attempted to explain:

> All of the contractors that you've asked me about utilized the same subcontractors. It's a very small community. These are general contractors that I went ahead and engaged to get a consultation on design, to get comparative proposals, and to go ahead and leverage their contractors and their subcontractors. So I can say with relative certainty that contractors that we've already demonstrated through other invoices and checks that did work on the 49 Glades project, both in the undisputed and disputed, worked for these three contractors.

Nevertheless, without any corroboration in the form of checks, the proposals were just that proposals - -not invoices that were paid by check or in cash.

Richardson's counsel, in cross examining Mills, established payments to contractors and suppliers set forth in Defendant's Exhibit 10, which total $540,926.03 should be increased by $72,500.00 to account for additional payments to a contractor identified as Leo Collins, as well as by $84,205.42, to account for additional payments to Oceanside Builders. Richardson also stipulated that DB&S was paid $126,925.83, not just the amount of $33,110.00 set forth on Exhibit 10. Richardson demonstrated, through Mills's evasive and unsatisfactory responses, that Project expenses set forth in the chart

35

summarizing Defendant's Exhibit 11 should be substantially decreased because Mills could not remember whether the charges were in fact attributable to the Project, or because extrinsic evidence established that they were not Project related, or because the expenses were incorporated in Defendant's Exhibit 10 (e.g., $2,130.00 payable to Joseph Sestitio, $4,320.00 payable to Joseph T. Cazeault & Sons, $30,155.00 payable to Arthur Pompeo, $1,338.00 to Brian Gosnell Flooring, $1,113.43 to C.A. Cunningham, $14,000.00 in cash paid to Ray Dupras).  In addition, Mills included in his Exhibit 11 chart setting forth $1,259,407.71 in Project expenses a payment to Alvin Hollis in the sum of $5,731.49 which was attributable to an invoice, bearing a customer number different from the one attributable to the Project.  That invoice was sent to Mills's spouse for work that preceded the execution of the contract between Mills and Alvin Hollis.  Similarly, Mills attempted to charge the Project the sum of $3,983.27 for legal fees incurred by "Hinckley Allen Snyder," writing a check on April 18, 2005 to pay an outstanding balance.  That firm performed services for MaxLax, while the firm of Kethro & Thomas, P.C. performed legal services for Mills and billed $1,462.50 which it was paid at the closing on April 15, 2005.[21]

---

[21] Mills insisted that this was a legitimate Project expense.  The Court disagrees based upon the following colloquy, which typified his responses to questions about many charges:

> It says, "Payment of outstanding balance".
> Q. Were they one of the law firms?
> A. I believe they are a law firm, yes.
> Q. What did you hire them for in this -- in 2005 for?
> A. It could have had -- could have been something for the -- the closing of the property.
> ***

Mills also issued a check to his accountant's firm, Morgan & Morgan, P.C., in the sum of $2,100.00 and to Scituate Harbor Marina in the sum of $1,700.00 and improperly charged the Project for those expenses. In addition, Mills included sums payable to Bank of America, as successor to Fleet, in the amount of $8,846.00 for the line of credit obtained for the Project, which sums Mills declared were capitalized costs for purposes of his 2005 tax return. He also included other capitalized costs, namely $68,365.42 in interest paid to the Bank of Canton, and $11,737.00 for interest paid to Black Rock. As capitalized costs, those expenses were not Project related construction costs.

Richardson also challenged the propriety as an expense set forth in the chart to Defendant's Exhibit 11 represented by Rockland check 1455 for $30,075.00, dated May 20, 2005, payable to Cash, with "Replacement Payment J Read" hand-written on its memo line, because it was used to purchase Rockland Trust treasurer's check 694403, for $30,050.00, dated May 20, 2005 after Rockland check 1454, for $30,000.00, dated May 17, 2005, payable to J. Read, with "1st Payment – Settlement" written on its memo line, bounced.[22] J. Read Corp. invoiced Mills $51,490.00 and that sum appears in Defendant's Exhibit 10. Nevertheless, Mills sought to charge the Project $278,770.00 for payments

---

Q. And do you recall hiring Hinckley Allen for 49 Glades Road?
A. I do recall needing to go ahead and get some additional clarification on some things and based on the fact this was a payment of an outstanding balance, I'm assuming that's what it was.

[22] Richardson adds: "In addition, because the full amount of J. Read's Project related expenses—$51,490— is included in Defendant's Exhibit 10.31, these checks, which total $91,025 should be subtracted from the $1,259,407.71 total of Defendant's Exhibit 11 in computing the Project-related expenses not already accounted for.

made to J. Read Corp., although he admitted 1) that J. Read Corp. did not finish the work
it proposed to do, 2) was engaged to perform construction work at MaxLax's Pembroke
facility, 3) only submitted invoices totaling $51,490.00 specifically relating to the Project,
and 4) Oceanside Builders was paid $235,874.00 to complete the Project.  Mills's
explanation of the work performed by J. Read Corp. does not warrant the inclusion of
any checks set forth in Defendant's Exhibit 11, especially where $51,490.00 is included in
Defendant's Exhibit 10.  To the extent that any of the checks in Exhibit 11 payable to J.
Read Corp. pertain to Project costs, they are duplicative of the agreed amount set forth in
Exhibit 10.

In addition, Richardson challenged the inclusion of a $360,000.00 counter check
payable to Black Rock as a Project related expense.  Moreover, Richardson suggested that
the checks in Exhibit 11, totaling $109,325.83 to DB&S should be deleted as he stipulated
that DB&S was paid $126,925.83 and those payments are included in Defendant's Exhibit
10.

In sum, Mills's accounting of Project related expenses and payments, as set forth
in his Exhibit 10 and chart to Exhibit 11, was replete with errors, duplications,
inconsistencies, and the absence of credible proof that numerous expenses were, in fact,
associated with the Project as opposed to the  MaxLax expansion.  On cross-examination,
Mills was unable to adequately explain the purpose of various expense items included in
his chart summary to Defendant's Exhibit 11 totaling $1,259,407.71.  The amount set forth
in invoices submitted by Mills as exhibits from various contractors, subcontractors and
suppliers did not correspond to the amount of checks issued by Mills or MaxLax in

38

payment of those contractors, subcontractors and suppliers. Although credit card payments and cash payments could account for the discrepancy, Mills was unable to testify unequivocally or credibly about the use of those funds. Thus, the Court concludes that the Project related expenses of $1,259,407.71 set forth on Defendant's Exhibit 11 bear no relation to reality and must be reduced to $109,901.88 and only then added to the expenses set forth in Defendant's Exhibit 10 as adjusted.

Mills conceded, during his testimony, that certain items listed in Defendant's Exhibit 11 were impermissibly charged to the Project. Nevertheless, he insisted that the Project related expenses totaled at least $1,060,527.71. The Court discredits and rejects Mills's testimony as unreliable and incredible.

Using Plaintiff's Exhibit 29, which was utilized by MacLellan to prepare Mills's 2005 tax return, the Court recalculates the cost basis for the Project as follows:

| | |
|---|---|
| Proceeds from sale | $2,022,000.00 |
| Deduction for repairs | ($23,938.00) |
| Net Proceeds | $1,998,062.00 |
| | |
| Purchase price for the Property | $675,000.00 |
| | |
| Construction Costs | |
| Legal | $1,450.00 |
| Building Permit | $3,304.00 |
| House Construction | $617,721.63 |
| Capitalized Costs | $143,827.00[23] |
| Total Cost Basis | $1,441,302.60 |
| Gain | $556,759.40 |

---

[23] These costs were comprised of mortgage interest payable to Rockland ($6,432.00), Bank of Canton ($111,674.00), and Bank of America, as successor to Fleet ($8,846.00), two sets of closing costs ($6,600.00 for a loan commitment fee and $7,500.00) and two sets of fees ($1,575.00 and $1,200.00).

The house construction cost of $617,721.63 is undoubtedly on the low side and the Court is aware that estimates obtained by Mills reflected higher construction costs. Nevertheless, this calculation supports the finding that the Project did not result in a loss that would deprive Richardson of repayment of his cash contributions and a share of profits.

Richardson, in his proposed findings of fact, calculated a profit for the Project of $172,783.09 after discounting the items that Mills could neither explain nor corroborate. Utilizing Richardson's methodology and adjusting them based upon this Court's consideration of Mill's testimony and exhibits, the Court is able to calculate a profit of $215,529.90 as follows:

| | |
|---|---|
| Purchase price for the Property | $675,000.00 |
| Building Permit | $3,304.00 |
| Capitalized Costs | $143,827.00 |
| Expenses (Adjusted Defendant's Ex. 10) | $507,819.75[24] |
| Additional Expenses (not included in Stipulated Amount) | |

| | |
|---|---|
| Oceanside Builders | $84,205.42 |
| DB&S Lumber | $126,925.83 |
| Electrolux | $2,059.00 |
| Leo Collins | $72,500.00 |
| Artemis Bowen, Inc. | $495.00 |
| Success Realty | $44,000.00 |
| Window Leak | $25,000.00 |

| | |
|---|---|
| Adjustments to Defendant's Ex. 11 chart summary | $121,334.14[25] |
| Total | $1,806,470.10 |

Regardless of how the calculation is made, however, the Settlement Statement from the April 15, 2005 closing is the best evidence of Project related costs and profit. The Project sold for $2,022,000.00, and Mills received a check for the net proceeds from the sale in the sum of $479,079.27 and subsequently received a check for $22,685.00 in excess deposit proceeds, for a total of $501,764.27.

---

[24] Richardson did not delete the sum of $33,110.00 in Exhibit 10 when he added $126,925.83 in payments to DB&S. Moreover, this Court concluded that Massachusetts electric was paid $206.59, not $202.00.

[25] Richardson, in his proposed findings, after deducting those expenses on the chart to Defendant's Exhibit 11 that were uncorroborated, duplicative, or impermissible, calculated costs of $130,973.09. This Court determines that the permissible construction costs in addition to those set forth on Defendant's Exhibit 10, to which Richardson does not object, total $109,901.88.

41

When the two most substantial expenses attributable to the Project are excluded, namely payments to J. Read Corp. in excess of the $51,490.00 invoiced amount, and the expense related to a counter check in the sum of $360,000.00 for the repayment of the Black Rock note executed by Mills in his capacity of manager of MaxLax, the Project made a profit.  After the payment of the Bank of Canton mortgage and other costs associated with the closing, Mills did not suffer a $71,221.00 loss, as he reported on his 2005 tax return.  His testimony that he believed the audit of his tax return confirmed the loss is neither conclusive nor reliable as Mills did not honestly and accurately report the Project's construction costs.  Moreover, the Project did not produce a $312,961.00 loss as claimed by Mills in his April 11, 2007 email to Richardson's attorney.

The Court does not discount Mills's testimony that problems, such as the contaminated soil from the oil tank and deficient architectural drawings may have led to cost overruns and a prolonged construction window.  Nevertheless, the overwhelming weight of the testimony and evidence establishes that Mills never properly accounted for the expenses of the Project, and he attributed costs to the Project that likely were related to MaxLax's Pembroke facility.  Indeed, Mills admitted that problems with J. Read Corp. cost him the MaxLax business.  The Court concludes that, contrary to Mills's testimony and consistent with McGoldrick's September 8, 2004 letter to Mills, the money that MaxLax borrowed from Black Rock was not used to fund the Project; rather, it was used to fund MaxLax's expansion.  Although Mills used the proceeds from the sale of the Property to repay Black Rock $360,000.00, he did not report any interest payments to Black Rock on his 2005 tax return as capitalized costs.  Moreover, he failed to establish

42

the amount of money he contributed to the Project, and his testimony that he contributed

$150,000.00 of his own money to the Project was devoid of documentary support and

preposterous in light of his emails to Richardson outlining the difficulties he was

experiencing with both the Project and the MaxLax expansion.

## III. DISCUSSION

A. <u>Applicable Law:  11 U.S.C. § 523(a)(4)</u>

Section 523(a)(4) provides:

(a) A discharge under section 727 . . . of this title does not discharge an
individual debtor from any debt-- . . .

> (4) for fraud or defalcation while acting in a fiduciary
> capacity, embezzlement, or larceny; . . .

11 U.S.C. § 523(a)(4). *See generally* Jonathon S. Byington, *The Challenges of the New*

*Defalcation Standard*, 88 Am. Bankr. L. J. 3 (2014); Zvi S. Rosen, *Discharging Fiduciary Debts*,

87 Am. Bankr. L. J. 51 (2013).  The standard of proof of each element of a § 523 claim is by

a preponderance of the evidence. <u>Palmacci v. Umpierrez</u>, 121 F.3d 781, 787 (1st Cir. 1997)

(citing <u>Grogan v. Garner</u>, 498 U.S. 279, 291, 111 S. Ct. 654 (1991)). The burden of proof and

the burden of production as to each element rests with the party contesting the

dischargeability of a particular debt under § 523. <u>Palmacci</u>, 121 F.3d at 788.  Nevertheless,

> [t]he burden of proof as to the defalcation element of 11 U.S.C. § 523(a)(4)
> is a shifting one. After first establishing that the debtor is acting in a
> fiduciary capacity, the creditor objecting to dischargeability must also
> demonstrate 'that its debt has arisen because the debtor-fiduciary has not
> paid the creditor funds entrusted to it.' '[T]he burden then shifts to the
> debtor-fiduciary to render an accounting to show that it complied with its
> fiduciary duties.'"

Hawks Holdings, LLC v. Kalinowski (n re Kalinowski), 449 B.R. 797, 814–15 (Bankr. D.

N.M. 2011), aff'd, 482 B.R. 334 (B.A.P. 10th Cir. 2012) (citations omitted). *See also* Otto v.

Niles (In re Niles), 106 F.3d 1456, 1461-62 (9th Cir. 1997); Dakota Steel, Inc. v. Dakota (In

re Dakota), 284 B.R. 711, 725 (Bankr. N.D. Cal. 2002).

Section 523(a)(4) of the Bankruptcy Code prohibits the discharge of an individual

debtor from any debt for "fraud or defalcation while acting in a fiduciary capacity" 11

U.S.C. § 523(a)(4).  In order for Richardson to prevail under this clause of § 523(a)(4), he

must establish three elements: "'First, the debt must result from a fiduciary's defalcation

under an 'express or technical trust' . . . Second, the debtor must have acted in a fiduciary

capacity with respect to the trust. . . . Third, the transaction in question must be a

defalcation' within the meaning of bankruptcy law.'" Raso v. Fahey (In re Fahey), 482

B.R. 678, 687 (B.A.P. 1st Cir. 2012) (citing Chao v. Duncan (In re Duncan), 331 B.R. 70, 77

(Bankr. E.D.N.Y. 2005) (internal quotations omitted).

"In order to be acting as a fiduciary, a party must be acting pursuant to an express

or technical trust, not a trust which the law implies from a contract." Breeds Hill Ins.

Agency, Inc. v. Fravel (In re Fravel), 485 B.R. 1, 14 (Bankr. D. Mass. 2013) (citing Davis v.

Aetna Acceptance Co., 293 U.S. 328, 333, 55 S. Ct. 151 (1934)).  An express trust requires

"an explicit declaration of trust, a clearly defined trust *res*, and an intent to create a trust

relationship." In re Fahey, 482 B.R. at 687 (quoting Gehlhausen v. Olinger (In re Olinger),

160 B.R. 1004, 1014 (Bankr. S.D. Ind. 1993)), whereas "[a] technical trust 'arises under

statute or common law.'" Fahey, 482 B.R. at 688.  State law is relevant in considering

whether such a trust exists, Petrucelli v. D'Abrosca (In re D'Abrosca), BAP No. RI 10-062,

44

2011 WL 4592338 at *5, (B.A.P. 1st Cir. 2011), but "one must . . . ascertain whether the
relationship was imbued with attributes giving rise to, in substance, a trust." LaPointe v.
Brown (In re Brown), 131 B.R. 900, 905 (Bankr. D. Me. 1991)).   In Farley v. Romano (In re
Romano), 353 B.R. 738 (Bankr. D. Mass. 2006), this Court explained:

> In Moore v. Murphy (In re Murphy), 297 B.R. 332 (Bankr. D. Mass. 2003),
> the court reiterated the observation of the First Circuit: "[t]he definition of
> 'fiduciary' for purposes of § 523(a)(4) has been narrowly construed. The
> term applies only to relationships arising out of express or technical trusts,
> and not to trusts that are implied in law as a remedy." Id. at 348.  As a result,
> the existence of fiduciaries duties alone does not establish fiduciary
> capacity for purposes of § 523(a)(4), Denton v. Hyman (In re Hyman), 320
> B.R. 493, 510 (Bankr. S.D.N.Y. 2005), aff'd 335 B.R. 32 (S.D.N.Y. 2005),
> although "[m]ost courts today . . . recognize that the 'technical' or 'express'
> trust requirement is not limited to trusts that arise by virtue of a formal trust
> agreement, but includes relationships in which trust-type obligations are
> imposed pursuant to statute or common law." LSP Inv. Partnership v.
> Bennett (In re Bennett), 989 F.2d 779, 784–85 (5th Cir. 1993), cert. denied, 510
> U.S. 1011, 114 S.Ct. 601, 126 L.Ed.2d 566 (1993).

In re Romano, 353 B.R. at 761.[26]

---

[26] Indeed, Jonathon S. Byington in his article, The Challenges of the New Defalcation Standard,
supra, observed:

> This initial narrow view limiting a fiduciary capacity to express and
> technical trusts is still followed by some courts, but others have greatly
> expanded the scope. Some have found that the technical or express trust
> requirement is not limited to trusts that arise by virtue of a formal trust
> agreement, but includes "relationships in which trust-type obligations are
> imposed pursuant to statute or common law." Others have begun to focus
> on "characteristically fiduciary duties over and above the obligations
> inherent in an ordinary, arm's length commercial relationship, whether
> such duties are created by contract, common law or statute."

> Even though the determination of whether someone is acting in a fiduciary
> capacity is an issue of federal law, courts have begun to "regularly" look to
> state law to determine whether a fiduciary capacity exists and have found
> a fiduciary capacity in a wide variety of circumstances. For example,

In <u>Richardson v. Mills (In re Mills)</u>, Adv. P. No. 11-1245, 2011 WL 6148662 (Bankr.

D. Mass. Dec. 12, 2011), this Court denied Mills' Motion to Dismiss Richardson's

complaint. In doing so, it set forth legal principles applicable to the determination of

fiduciary capacity. With respect to the power of attorney executed by Richardson, this

Court observed:

> In <u>Smith v. Marcet (In re Marcet)</u>, 352 B.R. 462 (Bankr. N.D. Ill. 2006), the
> court set forth the applicable law relative to powers of attorney. It stated:
>
>> A power of attorney is a written instrument whereby the
>> principal appoints the attorney-in-fact as agent and confers on
>> the attorney-in-fact the authority to perform acts on behalf of
>> the principal. <u>Artis v. West (In re West)</u>, 339 B.R. 557, 567
>> (Bankr. E.D.N.Y. 2006). Pursuant to Illinois law, a power of
>> attorney creates a fiduciary relationship as a matter of law.
>> <u>Boyce v. Fernandes</u>, 77 F.3d 946, 950 (7th Cir.1996); <u>Apple v.
>> Apple</u>, 407 Ill. 464, 95 N.E.2d 334, 338 (1950); <u>In re Estate of
>> Miller</u>, 334 Ill.App.3d 692, 268 Ill.Dec. 276, 778 N.E.2d 262, 266
>> (2002); <u>Lexington Health Care Ctr. of Elmhurst v. McDade (In

---

debtors have been found to be acting in a fiduciary capacity as the attorney
or escrow holder in connection with an attorney-client relationship, as a
partner in a partnership, as directors or officers of insolvent corporations,
as managers of limited liability companies, as joint venturers in a farming
operation, as trustees under the Perishable Agricultural Commodities Act,
as fiduciaries under the Employee Retirement Income Security Act of 1974
(ERISA), and as insurance agents collecting insurance policy premiums.

These various fiduciary capacities arise from many different sources. A
fiduciary relationship may be created by a state statute, a combination of
state statute and common law, a city ordinance, a federal statute, or by
private, voluntary agreements such as indemnity agreements, dealer sales
agreements, or instruments creating an express trust. Thus, there are many
different types and sources of fiduciary duties. With the scope of what
constitutes a "fiduciary capacity" broadening over time, the mental
standard from Bullock will apply to an ever-greater universe of debtor
conduct.

Byington, *supra,* at 11-13 (footnotes omitted).

re McDade), 282 B.R. 650, 659–60 (Bankr. N.D. Ill. 2002) (citing
Illinois cases). Accordingly, once the power of attorney was
executed, the Debtor was responsible as a fiduciary to Smith.
*See* In re Estate of Savage, 259 Ill. App.3d 328, 197 Ill. Dec. 575,
631 N.E.2d 797, 799 (1994). This Illinois rule, however, is not
outcome determinative under § 523(a)(4).

The general fiduciary duty created by a power of attorney
does not necessarily give rise to the fiduciary capacity
required by § 523(a)(4). West, 339 B.R. at 567; Valley Mem' l
Homes v. Hrabik (In re Hrabik), 330 B.R. 765, 773 (Bankr. D.
N.D.2005); Bast v. Johnson (In re Johnson), 174 B.R. 537, 541
(Bankr. W.D. Mo. 1994). Rather, the power of attorney gives
rise to an agency relationship. Id. However, if a debtor has an
elevated level of fiduciary duty, such a relationship could
give rise to the requisite fiduciary capacity required by §
523(a)(4). Id. According to the Seventh Circuit, in order to be
a fiduciary for purposes of § 523(a)(4), there must be "a
difference in knowledge or power between fiduciary and
principal which ... gives the former a position of ascendancy
over the latter." Marchiando, 13 F.3d at 1116.

In re Marcet, 352 B.R. at 473.

In re Mills, 2011 WL 6148662, at *5-6.  In addition, this Court addressed the parties'

relationship with respect to their joint venture or partnership, observing the following:

"[a]ccording to the court in Perez v. First Option Mortg. Corp. (In re Perez), No. 08–

40693–JBR, 2008 WL 4164372 (Bankr. D. Mass. Sept. 3, 2008), "[i]n Massachusetts, it is well

settled that execution of a power of attorney creates a fiduciary relationship." 2008 WL

4164372 at * 5 (citing Gagnon v. Coombs, 39 Mass. App .Ct. 144, 154 (2005))." In re Mills,

2011 WL 6148662, at *6.  This Court, citing Baker v. Friedman (In re Friedman), 298 B.R.

487, 498-99 (Bankr. D. Mass. 2003), added:

In Massachusetts, partners occupy a trust relation toward each other and
are bound to exercise the utmost good faith toward each other. Hawkes v.
First Nat'l Bank of Greenfield, 264 Mass. 538, 543, 163 N.E. 246 (1928).

47

Further, the standard of duty owed by partners to one another is one of utmost good faith and loyalty. Cardullo v. Landau, 329 Mass. 5, 8, 105 N.E.2d 843 (1952).

In re Mills, 2011 WL 6148662, at *6. *See also* Bane v. LeRoux (In re Curran), 157 B.R. 500

(Bankr. D. Mass. 1993);[27] In re Fordham, 130 B.R. 632, 648 (Bankr. D. Mass. 1991) ("It is

well established that a fiduciary obligation is indeed owed by one joint venturer to

another."). In Friedman, this Court considered the decision in Lewis v. Short (In re Short),

---

[27] Judge Hillman summarized the status of partners in Massachusetts for purposes of §

523(a)(4) as follows:

> Massachusetts courts have universally recognized the fiduciary relationship of partners and impose on them obligations of good faith and integrity in their dealings with one another in partnership affairs. Wilkes v. Springside Nursing Home, Inc., 370 Mass. 842, 353 N.E.2d 657 (1976); Cardullo v. Landau, 329 Mass. 5, 105 N.E.2d 843 (1952); Nelson v. Bailey, 303 Mass. 522, 22 N.E.2d 116 (1939). It is a fundamental characteristic of partnership that the partners' relationship is one of trust and confidence. One partner cannot, directly or indirectly, use partnership assets for his own benefit; he or she cannot, in conducting the business of the partnership, take any profit clandestinely, the partner cannot carry on the business of the partnership for private advantage; nor can he or she avail himself or herself of knowledge or information which may be regarded as property of the partnership. Latta v. Kilbourn, 150 U.S. 524, 541, 14 S.Ct. 201, 207–08, 37 L.Ed. 1169 (1893).

> The Supreme Court as well as Massachusetts common law clearly evince an intent that partners act as trustees for the benefit of each other with respect to the trust res which consists of the partnership assets. A partnership is an association. Mass. Gen. L. ch. 108A § 6(1). It is created by a voluntary contract. Boyer v. Bowles, 310 Mass. 134, 37 N.E.2d 489 (1941). The Court finds that Massachusetts partnerships satisfy the necessary elements of an express trust and that partners act in a fiduciary capacity toward each other for purposes of § 523(a)(4).

157 B.R. at 509–10.

818 F.2d 693 (9th Cir. 1987), in which the Ninth Circuit evaluated the business

relationship between joint venturers, observing the following:

> The debtor, Short, handled the affairs of the joint venture, which was
> profitable. Short and his spouse, however, appropriated the profits for
> personal living expenses, and when Short filed a bankruptcy petition the
> Lewises sought an exception to his discharge under § 523(a)(4).  In rejecting
> Short's argument that a partner is not a fiduciary, the court looked to state
> law, stating "[a]lthough the concept of fiduciary capacity is a narrowly
> defined question of federal law, state law can be consulted to determine
> when a trust exists." 818 F.2d at 695 (citing Ragsdale v. Haller (In re Haller),
> 780 F.2d 794, 797 (9th Cir. 1986)). The Ninth Circuit determined that "'if
> state law makes clear that a partner necessarily is a trustee over partnership
> assets for all purposes, then that partner is a fiduciary within the narrow
> meaning of § 523(a)(4).'" 818 F.2d at 695 (citing Haller, 780 F.2d at 797).
> Looking to both statutory and case law, the court concluded that the debtor
> was a fiduciary and owed the Lewises "the obligation of candor and utmost
> good faith in dealings with each other" as well as undivided loyalty. Id. at
> 695.

Friedman, 298 B.R. at 498.  In sum, as the United States Court of Appeals for the First

Circuit stated in Rutanen v. Baylis (In Baylis), 313 F.3d 9 (1st Cir. 2002), "[d]efalcation

may be presumed from breach of the duty of loyalty, the duty not to act in the fiduciary's

own interest when that interest comes or may come into conflict with the beneficiaries'

interest . . . ." Id. at 20.

Finally, in Bullock v. Bank Champaign, N.A., __ U.S. __, 133 S.Ct. 1754 (2013), the

United State Supreme Court resolved differences as to the state of mind required for

"defalcation.  Citing a decision of Justice Harlan, see Neal v. Clark, 95 U.S. 704, 708 (1878),

the Supreme Court held:

> [W]here the conduct at issue does not involve bad faith, moral turpitude, or
> other immoral conduct, the term requires an intentional wrong. We include
> as intentional not only conduct that the fiduciary knows is improper but
> also reckless conduct of the kind that the criminal law often treats as the

equivalent. Thus, we include reckless conduct of the kind set forth in the Model Penal Code. Where actual knowledge of wrongdoing is lacking, we consider conduct as equivalent if the fiduciary "consciously disregards" (or is willfully blind to) "a substantial and unjustifiable risk" that his conduct will turn out to violate a fiduciary duty. ALI, Model Penal Code § 2.02(2)(c), p. 226 (1985). See id., § 2.02 Comment 9, at 248 (explaining that the Model Penal Code's definition of "knowledge" was designed to include "'wilful blindness'"). That risk "must be of such a nature and degree that, considering the nature and purpose of the actor's conduct and the circumstances known to him, its disregard involves a gross deviation from the standard of conduct that a law-abiding person would observe in the actor's situation." Id., § 2.02(2)(c), at 226 (emphasis added). Cf. Ernst & Ernst v. Hochfelder, 425 U.S. 185, 194, n. 12, 96 S.Ct. 1375, 47 L.Ed.2d 668 (1976) (defining scienter for securities law purposes as "a mental state embracing intent to deceive, manipulate, or defraud").

Bullock, 133 S.Ct. at 1759-60. *See also* Byington, *supra*.

In Mills, this Court also noted that embezzlement is defined as follows:

[T]he fraudulent appropriation of property by a person to whom such property has been entrusted or into whose hands it has lawfully come. It differs from larceny in the fact that the original taking of the property was lawful or with [the] consent of the owner, while in larceny the felonious intent must have existed at the time of the taking.

2011 WL 6148662, at *5 (quoting Sullivan v. Clayton (In re Clayton), 198 B.R. 878, 884 (Bankr. E.D. Pa. 1996), and Rolley v. Spector (In re Spector), 133 B.R. 733, 741 (Bankr. E.D. Pa. 1991)). Embezzlement occurs when funds are transferred to a party who is authorized to receive them but who misappropriates the funds once acquired. 198 B.R. at 884 (citing Spector, 133 B.R. at 741). To prove embezzlement, under § 523(a)(4), the plaintiff must show "that (1) the debtor appropriated [the subject] funds for his or her own benefit; and (2) the debtor did so with fraudulent intent or deceit." In re Weber, 892 F.2d 534, 538 (7th Cir. 1989).

50

B. Analysis

Upon consideration of the testimony, exhibits and applicable law set forth above, the Court concludes that Richardson sustained his burden of proving by a preponderance of the evidence that a trust existed, that Mills was acting in a fiduciary capacity, and that Mills's obligation to Richardson was the result of fraud or defalcation while Mills was acting in at fiduciary capacity.  When the burden shifted to him to render an accounting to Richardson, Mills did not sustain his burden as his testimony and the documentary evidence upon which he relied in the form of, among other exhibits, Defendant's Exhibits 10 and 11, contained errors, and inconsistencies that Mills could not explain.  Mills could not corroborate that numerous payments of his personal credit card balances related to the Project.  *See, e.g.*, In re Kalinowski, 449 B.R. at 814-15.  Mills's testimony, the exhibits, including emails to Gaughan and Richardson, reflected the moving targets which were the costs and completion dates for the Project.  When coupled with Mills's misuse of Richardson's power of attorney to obtain a line of credit and to execute a Mortgage and Security Agreement and an unlimited Guaranty in favor of Black Rock with respect to MaxLax's obligations to Black Rock, there is substantial evidence of intentional wrong doing by Mills, particularly where he did not inform Richardson of the Black Rock loan to MaxLax, despite Richardson's expressed desire to be better informed about the status of the Project in September of 2004 and to execute necessary documents.

Richardson and Mills agreed, as joint venturers or partners, to acquire the Property, to tear down the existing house, and to construct a high-end dwelling.

Richardson agreed to invest his personal funds to initiate the endeavor and Mills agreed to oversee the Project.  Neither had the requisite experience in real estate development to successfully complete the Project when confronted with foreseeable circumstances, including delays attributable to contractors.  Richardson executed powers of attorney, granting Mills unfettered control over the Project, including obtaining institutional financing and engaging contractors and suppliers.  As a result of the powers of attorney, the terms of the parties' agreement, and Massachusetts law which imposes the duty of utmost good faith on partners sufficient to give rise to fiduciary capacity among them, Bane v. LeRoux (In re Curran), 157 B.R. at 509-10, the Court concludes that a trust was created whereby there was an explicit, though unwritten, trust, a clearly defined trust *res*, in the form of the Property and the monies borrowed to effectuate the Project, as well as an intent to create a trust relationship, a conclusion reinforced by Mills's ascendancy over Richardson in terms of day-to-day activities and the powers of attorney executed by Richardson. The Court rejects Mills's assertion that Richardson was merely an investor or creditor and that their relationship involved just a bad investment or breach of contract.   Mills, acting in a fiduciary capacity, owed Richardson a fiduciary duty based upon the powers of attorney Richardson executed, their status as joint venturers or partners, their long-time friendship, and Massachusetts law.  *See* In re Fordham, 130 B.R. at 684; In re Friedman, 298 B.R. at 498-99.  That fiduciary duty, when coupled with the difference in Mills's knowledge, control, and power with respect to the Project, compels this Court to find that Mills was acting in a fiduciary capacity with respect to Richardson and his cash infusions in the Project.  *See* In re Marcet, 352 B.R. at 473.  Richardson and

52

Mills owed each other fiduciary obligations as joint venturers or partners. Mills acted in a fiduciary capacity stemming not only from that long friendship but also from an agency relationship arising from the powers of attorney, their unwritten agreement, and the trust Richardson placed in Mills, which Mills accepted, to honor their agreement to construct a high end house, repay Richardson's investment of $315,000.00 and to share profits.

The Court has little doubt that Mills did not set out to engage in conduct that would financially harm Richardson and initially used Richardson's investments for their stated purpose, as well as the Fleet line of credit which facilitated getting the Project underway. Mills's defalcations occurred when he failed to inform Richardson of the line of credit, utilized loan proceeds from the Bank of Canton for purposes other than the Project, and failed to account and repay Richardson's investment and share in the profits following the April 15, 2005 closing as he deposited the settlement proceeds in MaxLax's account and paid obligations that he could not substantiate as Project related expenses.

Mills made profound errors attempting to act as a general contractor for the Project while simultaneously operating and expanding MaxLax. Mills failed to establish a separate bank account for depositing advances under the Construction Loan Agreement and for paying Project-related expenses. The lack of any financial controls, the use of multiple bank accounts in Mills's name, in MaxLax's name, and in the names of both Mills and Richardson, when coupled with the difficulties encountered by Mills with respect to the oil tank and poor performance by Burbridge and other contractors, contributed to Mill's dereliction with respect to the use of Project funds. When he embarked on the expansion of his MaxLax business, the temptation to commingle funds

and to utilize equity in the Property to obtain a loan from Black Rock proved insurmountable, resulting in his defalcation and failure to account.

Mills submitted two exhibits purporting to account for Project expenses. Richardson did not contest the legitimacy of the expenses totaling $540,926.03 set forth on Defendant's Exhibit 10.  With respect to the Project expenses set forth on the chart summarizing Defendant's Exhibit 11, Richardson, through his counsel's cross-examination, unequivocally established that Mills was unable to account for Project related expenses.  Moreover, when those expenses are recalculated to delete capitalized costs, as well as the $360,000 payment to Black Rock and the substantial payments to J. Read Corp., which only invoiced Mills $51,490.00 for the Project, the Project did not result in a loss.  Rather, as the proceeds from the April 15, 2005 sale of the Property establish, Mills obtained a check in the sum of $479,079.27 made payable to Curt Mills and Andrew Richardson, as well as a check in the sum of $22,685.00 in excess deposit proceeds.

Mills failed to inform Richardson of the Purchase and Sale Agreement or the actual closing or that he had received sums in excess of $500,000.00.  Instead of informing Richardson of the April 15, 2005 closing, Mills utilized the proceeds to repay Black Rock and other creditors of MaxLax, including J. Read Corp.  The Court rejects Mills's testimony that he used the loan proceeds that MaxLax obtained from Black Rock for Project related costs.  The Court also rejects Mills's testimony that he paid J. Read hundreds of thousands of dollars, particularly when he eventually paid Oceanside Builders $235,874.00, and this Court has concluded that corroborated construction costs only total approximately $617,000.00.

54

Mills insisted that his payment of credit card balances, totaling $17,945.54, from the proceeds of the April 15, 2005 sale was appropriate, as were payments totaling $78,760.48 which included payment to J. Read Corp. in the sum of $61,125.00, a payment to the law firm of Hinkley Allen & Snyder in the sum of $3,983.27, although this Court concludes that Mills's testimony that Hinkley Allen & Snyder performed services for the Project was unreliable. Similarly, the Court rejects Mills's assertion that he contributed $150,000.00 of his own money to the Project and his legal argument that his "decision to reimburse himself first[ ] was a business decision, not a gross deviation from the standard by which a normal law-abiding citizen would follow." Moreover, the Court finds Mills's reliance on this 2005 tax return and the decision of the IRS, at the conclusion of the audit, that he did not owe additional taxes unpersuasive.

This Court further concludes that Mills's conduct constituted defalcation within the meaning attributed to the term by the United States Supreme Court in <u>Bullock</u>. Mill's conduct evidenced intentional wrongdoing, particularly as the Court rejects as incredible his assertion that he informed Richardson of the April 15, 2005 sale of the Property to Bannick. In an email dated September 6, 2004, approximately three weeks after he informed Gaughan that he had terminated Burbridge and could complete the Project for $240,000.00-$265,000.00 using J. Read Corp., Mills told Richardson that he had "sunk about $400K" into his MaxLax business and was looking for "another $300K before it is finished," adding that he had invested $80,000.00 of his personal funds. Less than three weeks later, Mills, as manager of MaxLax, executed the $350,000.00 term note in favor of Black Rock. In an email to McGoldrick preceding the execution of the note and guaranty

55

that was to be secured by a mortgage on the Property, Mills represented that the cost to

complete the Project was $150,000.00. Although Mills in his emails to Richardson around

this time represented that he had invested $80,000.00 of his own funds, he never

established through testimony or documentary evidence when he infused funds. He

never identified the source of the funds or the time of their infusion into the Project during

his numerous hours on the witness stand when the burden of proof had shifted to him to

account for the loss reported to Richardson.

Mills's dissembling continued after the April 15, 2005 closing and reflect a

consciousness of guilt. After satisfying Black Rock and paying J. Read Corp. substantial

sums in excess of the amount actually invoiced for the Project, he persisted in misleading

Richardson. Although he admitted to using J. Read Corp. as a contractor with respect to

the MaxLax facility, he asserted in his August 7, 2007 email to Richardson that it had

obtained a lien on the Property. J. Read Corp., as evidenced by the April 15, 2005

Settlement Statement, did not have a lien on the Property and was not paid any sums at

the closing.

Similarly, in his January 24, 2006 email to Attorney Nunez, Mills failed to disclose

the April 15, 2005 closing, referencing a temporary occupancy permit for the Property,

final repairs and renovations, and warranty responsibility. In addition, in his April 11,

2007 email to Attorney Persaud, he referenced "a net sale price of $1,850,000.00 less

$69,740.00 in holdbacks and warranty coverage,' intimating a Project loss of over

$300,000.00. Mills appears to have pulled numbers out of thin air in suggesting a loss of

that magnitude in view of the $71,221.00 loss he reported to the IRS. Mills's emails were deceptive and misleading.

The Court's conclusion that the Black Rock loan proceeds were not used for the Project is reinforced by Mills's 2005 tax return and the worksheet prepared by MacLellan (Exhibit 29) which did not include any reference to that loan or interest paid to Black Rock in the capitalized costs of $143,827.00. Similarly, there was no reference to Mills's ostensible infusion of significant monies into the Project, other than what might have advanced as part of those capitalized costs.

The Court further concludes that Richardson satisfied his burden of proving embezzlement, namely "the fraudulent appropriation of property by a person to whom such property has been entrusted or into whose hands it has lawfully come." *See* <u>Sullivan v. Clayton (In re Clayton)</u>, 198 B.R. 878, 884 (Bankr. E.D. Pa. 1996) (quoting <u>Rolley v. Spector (In re Spector)</u>, 133 B.R. 733, 741 (Bankr. E.D. Pa.1991)). At the April 15, 2005 closing, Mills received a check that was made payable to him and Richardson. He deposited that check in a MaxLax account, ending in ****0019. In addition, he received a check from Hingham Institution for Savings that was payable to him and Richardson. Having failed to notify Richardson of the April 15, 2005 closing and his receipt of two checks totaling $501,764.27, Mills proceeded to use those funds to satisfy obligations unrelated to the Project. Mills lawfully obtained the proceeds from the sale of the Property; he used the proceeds to pay Black Rock $360,000.00 and J. Read Corp. approximately $60,000.00. He embezzled monies that were to be used to repay Richardson.

Having concluded that Richardson sustained his burden of proof as to liability, the Court must determine the amount of damages arising out of the Debtor's defalcation. The Court concludes that the best evidence of those damages is derived from the Settlement Statement from the April 15, 2005 closing. As noted above, those sums totaled $501,764.27, after the satisfaction of the Bank of Canton mortgage and the mortgage obtained by Oceanside Builders, as well as the payment of closing costs and certain Project related expenses. The Court concludes that Richardson was entitled to the repayment of the sums he contributed, totaling $315,000.00, to the Project, as well as the money he spent to satisfy the line of credit originally obtained from Fleet in the sum of $74,798.73 for a total of $389,798.73. When that sum is subtracted from $501,764.27, the sum of $111,965.54 remains to be divided between Richardson and Mills. Thus, the Court concludes Richardson is entitled to a judgment in the total sum of $445,781.50 as a result of Mills's defalcation and fraud while acting in a fiduciary capacity.

## IV. CONCLUSION

In view of the foregoing, the Court shall enter a judgment in favor of Richardson and against Mills pursuant to 11 U.S.C. § 523(a)(4). The sum of $445,781.50 owed by Mills to Richardson is excepted from discharge. In view of that conclusion, the Court concludes that it is unnecessary to rule on Count II under 11 U.S.C. § 523(a)(2)(A).[28] The Court shall

---

[28] Richardson did not set forth a separate Count under 11 U.S.C. § 523(a)(6), although in several paragraphs of his Complaint he alleged that Mills converted monies. For example, in paragraph 82, he alleged that "Mills intentionally, willfully, and maliciously converted the loan money." Were the Court to consider Count II or a count under 11 U.S.C. § 523(a)(6), the Court would conclude that Richardson failed to sustain his burden

enter a judgment in favor of Mills and against Richardson on Count IV.  As noted by the

court in <u>Sega Auto Sales, Inc. v. Flores (In re Flores)</u>, 535 B.R. 468, 488 (Bankr. D. Mass.

2015), a case involving a complaint under 11 U.S.C. § 523(a)(2)(A) and (a)(6), "[t]he 'basic

point of reference when considering the award of attorney's fees is the bedrock principle

known as the American Rule: Each litigant pays his own attorney's fees, win or lose,

unless a statute or contract provides otherwise.'" <u>Id.</u> at 488 (citations omitted).  As in

<u>Flores</u>, there is no applicable statute or contract that would permit deviation from the

American Rule.

By the Court,

Joan N. Feeney
United States Bankruptcy Judge

Dated:  August 22, 2016

---

of proof.  Because the Plaintiff failed to set forth a separate count under § 523(a)(6) or brief
issues under § 523(a)(6), the Court concludes that such claim is waived.